**SCOTTSDALE INSURANCE COMPANY, Plaintiff,**

v.

**HOMESTEAD LAND DEVELOPMENT CORPORATION, et al., Defendants.**

**No. C 90 3144 SBA (WDB).**

United States District Court, N.D. California.

May 18, 1992.

John A. Belcher of Richards, Watson & Gershon, Los Angeles, CA, for plaintiff.

Stephen Dennis and Paul Cyril of Cyril & Crowley, San Francisco, CA, for defendants.

## REPORT AND RECOMMENDATION

BRAZIL, United States Magistrate Judge.

### I. INTRODUCTION

This Report and Recommendation is responsive to an order by the Honorable D. Lowell Jensen instructing us to "allocate costs between those which are reasonably related to defense of the slander claim and those which relate to uncovered claims." Order filed April 11, 1991.

The lawsuit in this court that gives rise to this assignment is a declaratory relief action in which an insurer, Scottsdale Insurance Company (Scottsdale), is asking the court to fix the extent of its responsibility to its insured, Homestead Land Development Corporation (HLDC or Homestead).

Scottsdale concedes that it is obligated to pay for a portion of legal expenses that Homestead incurred in the underlying state court action, but that its obligation is limited to the relatively small percentage of the overall litigation bill that, in Scottsdale's view, can reasonably be attributed to defense of the only cause of action that Scottsdale's policy covered, i.e., the cause of action for slander. Homestead, by contrast, insists that it was necessary to litigate a wide range of matters that sounded nominally in contract and business tort theories in order to defend the slander claim, and therefore that Scottsdale is responsible for the vast majority of the fees and costs Homestead incurred in the state court action. Judge Jensen assigned us the task of determining, in the first instance, how much of the fees and costs that the insured says it incurred in the underlying state court action are fairly attributable to the defense of the slander claim. See *Amended Order* of April 11, 1991 and Order of August 1, 1991, attached as Exhibits A and B to the Declaration of John A. Belcher filed December 6, 1991.

On grounds that we elaborate in detail in the pages that follow, we find that the total expense universe in issue here is $542,010.29 and we recommend that the court declare that Scottsdale is liable to Homestead for 10% of that amount ($54,201.03).

We organize this Report and Recommendation as follows. In the next section, Section II, we describe briefly the procedural history of both the underlying state court action and the suit in this court. In Section III we set forth our understanding of the legal principles (under California law) which govern the apportionment we undertake. Then, in Section IV, we describe what the evidence shows about how much of the legal work undertaken on behalf of the insureds is fairly attributable to the defense of the slander claim. We consider, in that section, (1) the structure of the case (viewed primarily through the pleadings) during the relevant period, (2) evidence from pretrial records such as deposition summaries, responses to interrogatories, memoranda submitted in connection with a demurrer to Jacobson's amended cross-complaint, and settlement conference statements, (3) the billing documents generated by Homestead's outside counsel, and (4) declarations submitted in this proceeding by some of the lawyers who worked on the

underlying litigation. In the end, our recommendation about the actual dollar amount for which Scottsdale should be liable builds simultaneously from both our detailed consideration of the specific evidence that is available and from a detached consideration of the structure of the underlying state court action.

Given the imperfect nature of the evidence with which we are working (as described more particularly below), it is inevitable that the intellectual movement that we make from data to conclusion is not as tight and linear as we would like. We concede some modest margin of error. We agree strongly with Judge Jensen, however, that this is a case in which California law and policy compel that an apportionment be made and that the reliability of the method by which the final figures are calculated here is well within the range of what should be acceptable under the circumstances. This is an instance, in other words, where the courts should refuse to permit the impossibility of scientific exactitude to compel a fundamentally unfair result.

## II. BACKGROUND AND HISTORY OF THE CASE

In 1986 HLDC launched development of an apartment complex called the Fairways in Citrus Heights, California. Scottsdale issued Homestead a general liability policy covering April 1, 1986 through October 1, 1986 (the coverage eventually was extended through November 15, 1987). The policy covered accidental property and personal injury damage, as well as libel and slander.

HLDC contracted with Karl F. Jacobson (Jacobson) of KFJ Construction to construct the wood frames for the Fairways development. Construction, however, did not progress well, and the job site grew tense. Disputes began surfacing about the quality of materials and workmanship, timeliness of performance, prices, contract responsibilities, and billing cycles. These disputes involved not only HLDC and its general contractor, Jacobson, but also the lumber supplier for the framing, Canfor U.S.A. (Canfor).

On May 10, 1987, Homestead sued Jacobson in Superior Court in Sacramento for breach of contract, fraud, misrepresentation, and negligence, praying for some $300,000 in compensatory damages and $500,000 in punitive damages. The law firm that HLDC hired to prosecute this action was Weintraub, Genshlea, Hardy, Erich & Brown (Weintraub). HLDC did not claim when it initiated that state court action that Scottsdale had any obligation to reimburse HLDC for any of the litigation expenses it incurred in that matter.

Canfor also sued Jacobson over a dispute relating to the same site. Eventually (in early 1990) the cases were consolidated into the *Fairways Construction Cases II*, in Yolo County Superior Court, as Judicial Counsel Coordination Proceeding No. 2433.

Well before that consolidation, Jacobson had filed a cross-complaint in the action Homestead had initiated. This pleading, filed on December 14, 1987, contained six causes of action, in five of which Homestead was named as a cross-defendant (Jacobson also sued Martin D. McGinnis, a former Canfor and Jacobson employee, in this cross-action). The gravamen of the cross action was breach of contract and tortious interference with prospective business advantage. While one of the causes of action (conspiracy to interfere with Jacobson's performance of the contract and to deny him the benefits of his bargain) included, among many other allegations, an assertion that both McGinnis and Homestead made unspecified "false representations to cross-complainant [sic] workers," notably absent was any cause of action sounding in slander (or any other defamation). See Cross–Complaint, Exhibit A attached to Declaration of Roger A. Brown filed January 10, 1992.

Initially, Jacobson represented himself. Subsequently, his insurer provided him with an attorney. In August of 1989, in the face of *Cumis* problems, Jacobson retained independent counsel, Wohl and Eggleston. *See* Declaration of Steve Eggleston, filed January 24, 1992, ¶ 3–6.

While there had been vague references earlier in the case development process to allegedly inaccurate disparaging remarks about Jacobson and his work,[1] it was not until early March of 1990, during a deposition of Martin McGinnis, that specific factual bases for a slander cause of action surfaced. First McGinnis, then apparently some other deponents, mentioned statements allegedly made by Clifford Seavey, an employee of HLDC, to the effect that Jacobson would go to jail for failure to pay payroll taxes. On March 26, 1990, Homestead sent a letter purporting to tender to Scottsdale defense of the entire cross-complaint by Jacobson.[2] This tender was justified on the theory that exposure to a slander cause of action had been uncovered during discovery and that the possible slander claim was inextricably intertwined with the other causes of action. At that juncture no cause of action sounding in slander had been pled against HLDC, and Scottsdale maintained that Homestead had failed to demonstrate grounds for coverage under the policy. See letters attached as Exhibits B–E to Declaration of Lewis J. Soffer, filed January 10, 1992.

Then in late June of 1990 Jacobson amended his cross-complaint. See *Amended Cross–Complaint*, attached as Exhibit B to Declaration of Roger A. Brown, filed January 10, 1992. The amended cross-complaint included fourteen causes of action and added Homestead Savings & Loan and Homestead Financial as cross-defendants. *Id.* It also asserted claims against Canfor, Marty McGinnis and doe defendants. *Id.* The causes of action that dominated the amended pleading sounded in contract and business tort theories (e.g., that Homestead had breached its contractual commitments to Jacobson, that it received goods and services for which it had not paid, that it had intentionally induced Jacobson to perform with no intention of honoring its commitments, that it had conspired with others, including Canfor, to intentionally interfere with his contractual rights and prospective business advantages, etc.).

Among the fourteen causes of action in the amended complaint only one (the sixth) sounded in defamation against Homestead (the seventh cause of action charged Canfor with a separate slander, based on statements wholly unconnected with the allegedly slanderous words uttered by Homestead). Jacobson alleged in the sixth cause of action that during November and December of 1986 and January of 1987 "cross-defendant Homestead spoke the following words of and concerning cross-complainant:

a. cross-complainant JACOBSON was going to jail for tax fraud." *Id.* at 12. Jacobson further asserted that certain named and unnamed individuals heard these words, that the words were defamatory, and that Homestead's uttering them caused Jacobson to suffer unspecified damages. *Id.*

In August 1990, after Jacobson filed his amended cross-complaint, Scottsdale, under reservation of rights, accepted the defense of the *slander* claim and forwarded a check for $50,000 to Homestead. See Exhibit F to the declaration of Lewis J. Soffer, filed January 10, 1992. The insurance company emphasized that it was only obligated to fund Homestead's defense of the slander claim, and that it had no role to play in the prosecution or defense of the other claims. *Id.* HLDC, however, insisted that Scottsdale was responsible for most, if not all, of its costs and attorney fees in the Jacobson litigation. See letters attached as Exhibits A–D to the Declaration of Paul H. Cyril, filed February 19, 1992.

Allegations of fraud, kickbacks, corruption, and conspiracy with a competing framing contractor circulated among Canfor, Jacobson, and Homestead. See Deposition Summaries of Seavey, McGinnis, Jacobson, Cook, attached as Exhibit J to the Declaration of John Belcher, filed December 6, 1991. Jacobson subsequently named

---

**1.** See letter from Lewis J. Soffer to Cecil Mesborn, dated March 26, 1990, tendering defense of the cross-complaint to Scottsdale and referring to answers in mid–1989 by Jacobson to interrogatories propounded by Homestead, attached as Exhibit B to the Declaration of Lewis J. Soffer filed on January 10, 1992.

**2.** Id.

as defendants two additional Homestead employees, Jacques Peasha, an HLDC officer, and Clifford Seavey, a foreman on the Fairways project who had had a tense relationship with Jacobson. The addition of the new cross-defendants and the explication of the evidence through discovery created concerns about possible conflicts of interest that ultimately led the Weintraub firm (in November of 1990) to substitute out of the case. Four other law firms ended up representing various Homestead entities or officers in the Jacobson litigation.

Following Weintraub's withdrawal, Scottsdale supported the substitution in of the law firm of Donahue & Callaham to represent Homestead. A disagreement between Homestead and Scottsdale surfaced, however, about whether the Donahue firm would be sufficiently independent of Scottsdale's influence to meet the requirements of *San Diego Navy Fed. Credit Union v. Cumis Insurance Co.*, 162 Cal. App.3d 358, 208 Cal.Rptr. 494 (1984) and its progeny.

In the spring of 1991 Homestead decided that it should be represented in the underlying action by the firm of Hoge, Fenton, Jones & Appel (Hoge, Fenton), which for several months had been representing related entities Homestead Financial and Homestead Savings & Loan in that action. In April of 1991 Homestead Financial, Homestead Savings & Loan, Peasha, and Seavey reached a settlement with Jacobson. See Letter of April 12, 1991 from Thomas Denver to Erwin Adler, attached as Exhibit A to Declaration of Thomas Denver, filed February 19, 1992. Jacobson dropped all claims against these defendants in exchange for $160,000. *Id.* Shortly thereafter, Hoge, Fenton became counsel of record for HLDC.

There was some preliminary correspondence between Hoge, Fenton and Scottsdale regarding the firm's qualifications. See Declaration of Thomas Denver, *supra*, and attached exhibits. Scottsdale insists that it never approved Hoge, Fenton's representation of HLDC and therefore that, under the terms of its policy, it has no obligation to reimburse HLDC for any portion of the legal fees and costs for which it was billed by Hoge, Fenton. Homestead, by contrast, insists that Scottsdale tacitly approved the representation (or could not legally have refused to do so). This is one of the issues we address in a subsequent section. While this issue remained unresolved, Homestead and Jacobson continued to work toward a settlement, which they finally achieved in the summer of 1991.

During 1990 and 1991, Homestead attempted to recover its costs and attorneys fees from Scottsdale. Scottsdale demanded that Homestead allocate the attorney fees; Homestead refused. On November 1, 1990, Scottsdale filed the instant declaratory relief action, asking this court to determine whether it had a duty to bear the entire cost of defending the Jacobson cross-complaint or only the cost of defending the slander cause of action.

Homestead moved to dismiss Scottsdale's Complaint for Declaratory Relief. Ruling on that motion, Judge Jensen concluded that Scottsdale was required to reimburse Homestead only for those expenses reasonably related to defense of the slander cause of action and that allocation was feasible and appropriate under the circumstances. *Amended Order* of April 11, 1991.

Thereafter, Homestead filed counterclaims against Scottsdale, alleging, among other things, that Scottsdale had breached an obligation under the policy by refusing to fund the defense of Jacobson's other claims and had breached the implied covenant of good faith and fair dealing both in the way it handled Homestead's request that Scottsdale fund the defense of the Jacobson cross-complaint and in its refusal to fund any aspect of that matter other than the slander claim. After the issues were fully briefed, Judge Jensen ruled that Scottsdale had breached neither its duty of good faith and fair dealing nor its duty to defend Homestead under the relevant policy. *Order* of August 1, 1991.

When the fee allocation assignment reached this court we at first spent considerable time encouraging the parties to work toward a settlement. They made sev-

eral attempts, facilitated by substantial exchanges both of underlying information and of written arguments about the applicable legal principles. In the end, these efforts failed. The parties then submitted to us extensive briefs, accompanied by numerous declarations, copies of pleadings, motions, responses to discovery, deposition and hearing transcripts from the underlying state court action, as well as billing records from the firms that represented Homestead in that suit. Despite the volume of material submitted, there are respects, which we detail in a subsequent section, in which what we have had to work with is incomplete or not fully adequate. We deemed the matter submitted in late February of this year, after the last filing by Homestead.

### III. THE APPLICABLE LEGAL NORMS

*A. In This Allocation Proceeding, How Heavy Is the Burden of Proof That the Insurance Company Must Carry?*

The undersigned serves in this matter as a special master pursuant to the order of an Article III judge. In that capacity, I am in no position to reevaluate the merits of decisions already reached by the district court. As Homestead explained to us in six pages of its Opposition Brief, we are bound by the law of the case. See *Opposition Brief* at p. 3–9.

For purposes of determining what legal standards to apply in fulfilling the assignment given us, the "law of the case" includes the following important findings by the district court. First, Judge Jensen found that Scottsdale did not breach its contract[3] with Homestead. *See Order* of August 1, 1991, at p. 506. Second, Judge Jensen found that Scottsdale's handling of Homestead's tenders and defense did not constitute a breach of the covenant of good faith and fair dealing. *Id.* at p. 8–9.

These findings (no breach, no bad faith) have very significant implications for our analysis of the issue next in order: what is the level of certainty that Scottsdale must achieve in order to meet its burden in *this* apportionment proceeding? Homestead argues vigorously that Judge Jensen has already answered this question, and that his answer is the "undeniable evidence" standard of *Hogan v. Midland National Insurance Company*, 3 Cal.3d 553, 564, 91 Cal. Rptr. 153, 476 P.2d 825 (1970). The support for the view that Judge Jensen has decided this issue is footnote 3 of his Amended Order of April 11, 1991, where, in reference to his order that a magistrate "allocate costs between those which are reasonably related to defense of the slander claim and those which relate to uncovered claims," the Judge wrote: "The Court notes that at such proceedings, plaintiff has the burden of showing the allocability of such costs. *Hogan v. Midland National Ins. Co.*, 3 Cal.3d 553, 91 Cal.Rptr. 153, 476 P.2d 825 (1970)."

It is very clear from this footnote that Judge Jensen has ruled that the burden of persuasion in the allocation proceedings rests with Scottsdale. It is not at all clear, however, that the Judge purported to decide *how heavy* that burden should be. We are convinced that Judge Jensen did not consider this discrete sub-issue, and that his citation to *Hogan* should not be construed as indicating anything more than what the sentence that precedes it says, namely, that the plaintiff bears the burden of persuasion.

Several important considerations support our conclusion that Judge Jensen did not purport to decide how heavy the burden of persuasion should be in this case. One is that this issue is foreseeably of considerable importance in a setting like this, and if Judge Jensen had in fact decided the matter, it is unlikely that he would have left that fact, and the content of his decision, to inference. Second, and perhaps more important, since Judge Jensen cited *Hogan*, we assume that he knew that, in some very

---

**3.** The relevant clause of the Scottsdale insurance policy states: "4. The company shall have the right but no obligation, in all cases at its own expense, to assume charge of the defense and/or settlement of any claim. . . ." See the copy of the insurance contract, attached as Exhibit D to the Declaration of John H. Belcher, filed January 24, 1992.

**530**

important particulars, the facts in that case were quite different from the facts in the *Scottsdale* matter. Specifically, Judge Jensen already had found in *Scottsdale* that a fair allocation of expenses was both feasible and called for under the law,[4] in part because it was so clearly unreasonable to argue that the contract and business tort parts of the case were not conceptually severable from the only covered claim, the cause of action for slander. In *Hogan,* by sharp contrast, the California Supreme Court went to considerable pains to point out that the covered and the uncovered claims were tightly intertwined, in both law and evidence, and that it could not have been clear until the findings of fact were made after the trial that certain aspects of the matter fell outside the coverage of the insurance policy that was in issue.

These significant differences between *Hogan* and the case at bar point to another important consideration that supports our inference that Judge Jensen did not decide that the "undeniable evidence" standard should be imposed on Scottsdale in this case. There would be a profound tension between first ruling, in this case, that allocation is both feasible and appropriate, and then announcing that the carrier could avoid liability for the fees and costs incurred in defending *all* of the many claims by Jacobson against Homestead *only* if the carrier could prove by "undeniable evidence" that certain expenses were related only to uncovered aspects of the litigation.[5] We have little doubt that in some cases parties could satisfy that demanding standard, especially if the analysis took place at a rather general level, e.g., by relying principally on the form of allegations in the pleadings. But there are likely to be a

sizeable number of other cases, like the one at bar, where rigid adherence to the "undeniable evidence" standard predictably would yield an obviously unfair result. That unfairness would occur when it was obvious from the pleadings *and a detailed examination of how the litigation was actually conducted* that the lawsuit's conceptual and evidentiary center of gravity was not even arguably covered by the insurance policy in issue, but, because of the opaque way counsel kept records and blurred work it would be virtually impossible to show with "undeniable certainty" that most of the expense-generating lawyering was not attributable to the covered claim. Given the foreseeability of that scenario, we are not inclined to infer that Judge Jensen intended to appear to give plaintiff access to relief with one hand, only to take it back with the other.

The arguable senselessness of such an approach leads us to focus on another issue that is partially hidden within this conceptual tangle. There might be a distinction between proof of allocability (as a general proposition, e.g., by focusing on the separation of claims in pleadings), on the one hand, and, on the other, proof of whether *individual expenses* are attributable only to uncovered claims. While we need not resolve this issue because of the independent basis for our judgments about what the applicable law is, we note that it might be possible to read Judge Jensen's Amended Order of April 11, 1991, as well as *Okada v. MGIC Indem. Corp.,* 823 F.2d 276 (9th Cir.1986) and *Gon v. First State Ins. Co.,* 871 F.2d 863 (9th Cir.1989),[6] as proceeding on the assumption that what a carrier-plaintiff must show by "undeniable evidence" is the larger, more general prop-

**4.** "[T]he court finds an allocation of costs between covered and uncovered claims may be made and that plaintiff is obligated to pay only for defending those claims covered under the policy, i.e., the slander claim." See *Amended Order* of April 11, 1991, at page 6–7, lines 23–2.

**5.** In *Okada v. MGIC Indemnity Corporation,* 823 F.2d 276 (9th Cir.1986), a case formally decided under Hawaiian law, the apportionment was made based on the pleadings. In a case decided under California law, *Gon v. First State Insurance Company,* 871 F.2d 863 (9th Cir.1989), the

Ninth Circuit agreed that allocation was legally acceptable under some circumstances, but ruled that under the facts of the case before it no allocation was feasible.

**6.** Judge Jensen specifically cited *Gon* and *Okada* in his April 11 Amended Order. *See Amended Order* at p. 6–7 ("Applying the principles set forth by this Circuit in *Okada,* the Court finds an allocation of costs between covered and uncovered claims may be made and plaintiff is obligated to pay only for defending those claims covered under the policy ...".).

osition that "allocability" is feasible and appropriate. Once that showing is made, the theory would go, it is not necessary (or fair) to require the carrier-plaintiff to pay for every single item litigation expense that it cannot prove by "undeniable evidence" was attributable only to an uncovered claim.

While it might make sense for courts to make this kind of distinction (between allocability at a general level, on the one hand, and, on the other, the degree of certainty with which individual items of expense should be tied to covered or uncovered parts of the underlying litigation), we are not at all sure that doing so can be squared with *Hogan*. The *Hogan* court acknowledged no such distinction; instead, it declared that a carrier *in that setting* (which, crucially, including a previous finding of wrongful conduct) should be required to adduce "undeniable evidence of the allocability of specific expenses." *Hogan*, 3 Cal.3d at 564, 91 Cal.Rptr. 153, 476 P.2d 825.

Thus, in our view, the most clearly principled basis for distinguishing *Hogan* from the case at bar focuses not on the conceptual level (generality vs. specificity) with respect to which certainty about allocability is required, but on the adjudicated conduct of the carrier. Even a hasty reading of *Hogan* reveals that the California Supreme Court relied on an important factual (and public policy) predicate for the decision to impose the demanding "undeniable evidence" burden. In *Hogan*, the courts already had found, as a crucial predicate fact, that the carrier had wrongfully refused to defend the underlying action; the California Supreme Court knew that the

insurance company had "breached its contract to defend." *Id.* at 159, 476 P.2d at 831. It was, primarily, that already established "wrongful refusal" to defend that justified imposing such a heavy burden of persuasion on the carrier.[7]

Yet in the *Scottsdale* matter, Judge Jensen knew, at the time he wrote the footnote citing *Hogan*, that no such finding had been made. Thus we find it extremely unlikely that he determined, at that premature juncture, how heavy the burden of proof on Scottsdale should be. For all these reasons, we conclude that the district court has not ruled on the issue of how heavy the burden of persuasion should be. Given the openness of that question, we address it afresh here, thus developing a recommendation for Judge Armstrong (to whom this case recently has been transferred from Judge Jensen).

■■ For reasons we detail in the paragraphs that follow, we conclude that under California law, when 1) the carrier has not breached a contractual obligation to its insured; 2) the carrier has processed the insured's claims in good faith; and 3) there is substantial separation between the principal evidentiary bases for the covered claims and for the uncovered claims, the burden the insurance company must bear in establishing which expenses are not related to the covered aspects of the underlying action is the same burden that civil litigants generally must bear: preponderance of the evidence. While the decisions of the California courts of appeal that touch on this matter (often obliquely) create a backdrop that is hardly free from ambiguity,[8] we are convinced that this is the current state of California law and that

---

7. The importance of that predicate fact was emphasized by the California Supreme Court five years later in *Bertero v. National General Corp.*, 13 Cal.3d 43, 61–65, 118 Cal.Rptr. 184, 529 P.2d 608 (1974). See discussion of this case in the text, *infra*.

8. Perhaps the most troublesome California authority is *California Union Ins. Co. v. Club Aquarius, Inc.*, 113 Cal.App.3d 243, 169 Cal.Rptr. 685 (1980), where the court of appeal purported to use an undeniable evidence burden without a finding that the carrier had breached any obligation to its insured.

We do not believe that *Club Aquarius* represents a definitive resolution of the issue explored in the text, above. That court did not explain why the "undeniable evidence" standard was applicable, showed no sign that it was aware of *Bertero v. National General Corp.*, 13 Cal.3d 43, 118 Cal.Rptr. 184, 529 P.2d 608 (1974), and proceeded with its analysis in a manner that raises serious questions about whether the court in fact used the demanding standard that it had purported to endorse (it found that an allocation could be made).

the California Supreme Court would unequivocally so hold if given the opportunity.

Over the past four decades California courts have sought to articulate doubt resolution rules that substantially reduce the likelihood that individual insureds will be left defenseless as a result of apparently self-serving decisions by carriers to deny a duty to defend pending resolution of substantive coverage issues. *E.g., Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 54 Cal.Rptr. 104, 419 P.2d 168 (1966); *Hogan v. Midland Natl. Ins. Co.*, 3 Cal.3d 553, 564–65, 91 Cal.Rptr. 153, 476 P.2d 825 (1970); *Giddings v. Industrial Indemnity Co.*, 112 Cal.App.3d 213, 169 Cal.Rptr. 278 (1980); *St. Paul Fire and Marine Insurance Co. v. Sears, Roebuck & Co.*, 603 F.2d 780 (9th Cir.1979). In other words, a purpose of the law has been to pressure carriers, generally, to resolve doubts about the reach of the duty to defend in favor of their insureds.

At the same time, however, the courts have recognized that insurance policies are contracts whose terms are not limitless.[9] In effect, California law has recognized that coverage questions involving the duty to defend could fall into any one of three zones (perhaps most clearly visualized as three concentric circles). The first zone is at the center and is white. It represents situations where reasonable people could not deny that the duty to defend is triggered. The second zone, immediately surrounding the first, is gray. It represents situations in which reasonable people could disagree about whether there is a duty to defend. The third and final zone surrounds the second and is black. It represents those situations in which it is not reasonably arguable that the duty to defend has been triggered.

As we understand it, expansive California law about the scope of the duty to defend has implicated only the first and second of these two zones. Courts have wanted carriers to be generous in marking the boundaries of the gray zone, and then to honor arguable obligations under their policies in situations that fall within it. But if a carrier defines the gray zone with appropriate latitude, there remains no public policy rationale for imposing on it additional burdens or penalties.

Turning more directly to the issue at hand, we infer that California courts have applied the demanding "undeniable evidence" standard only in situations that fall within the gray zone. In those situations the courts have developed this demanding standard both as a means to deter carriers from violating the public policy that requires resolution of doubts in favor of the insured and as a way of punishing carriers who have been found to violate that policy. It should be clear, however, that the rationale for imposing such a heavy burden disappears when there has been an affirmative finding, as in the case at bar, that the carrier has *not* breached its duty to defend or the implied covenant of good faith and fair dealing.

The effect of making such a finding is to conclude that the carrier's conduct never posed a threat to the general policy objective of being sure that doubts are resolved in favor of the insured. The duty to defend is triggered, generally, when it is *reasonably arguable* that coverage for damages attaches. Because in the underlying case the absence of the duty was clear (except with respect to the slander claim), the carrier never was within that gray zone (where coverage is arguable) where the public policy would have been threatened. As noted above, in the process of justifying the demanding burden it imposed, the *Hogan* court pointedly noted that there already had been a judicial finding that the carrier had refused wrongfully to defend the insured.[10]

---

**9.** *See, e.g., Royal Globe Ins. Co. v. Whitaker*, 181 Cal.App.3d 532, 536–38, 226 Cal.Rptr. 435 (1986) (no duty to defend breach of contract and fraud claims under a comprehensive business policy); *American Guar. & Liability v. Vista Medical Supply*, 699 F.Supp. 787, 793–94 (1988) (under California law, no duty to defend wrongful discharge, sexual harassment, and misrepresentation claims under a general liability policy).

**10.** *See Bertero v. National General Corp.*, 13 Cal.3d 43, 61–65, 118 Cal.Rptr. 184, 529 P.2d 608 (1974), where the Court held that a preponderance of the evidence burden applied where

*Hogan* is distinguishable from the case at bar in another significant way. The *Hogan* court carefully explained that in the underlying lawsuit there was such a dense factual (and perhaps legal) interdependence among the various claims for relief that it was virtually impossible for the carrier to argue, in the Court's view, that the duty to defend that clearly attached to part of the case did not extend to the case in its entirety. 3 Cal.3d at 564 & n. 7, 91 Cal.Rptr. 153, 476 P.2d 825. In the *Hogan* court's view, the very density of that factual interdependence meant that *all* of the claims fell within the gray zone into which the broad duty to defend extended. *Id.* In the case at bar, in sharp contrast, Judge Jensen already has indicated that there need be relatively little overlap between the factual bases for the covered slander claim, on the one hand, and for the clearly uncovered contract and business tort claims, on the other. Thus, unlike *Hogan*, it is *un*reasonable to argue that the uncovered claims fell within that gray zone, and the public policy concern over carriers leaving insureds defenseless simply is not implicated.

Given the absence of a justification for applying the *Hogan* standard, we conclude that it is appropriate to require plaintiff to meet only the preponderance of the evidence standard in *this* allocation litigation.

B. *If the Court finds that the underlying litigation clearly was dominated by uncovered claims, should Scottsdale be liable under its policy only for those litigation activities that its counsel would not have undertaken but for the presence of the covered slander claim?*

■ In reviewing the records associated with the underlying state court proceedings we have encountered some litigation activity on Homestead's behalf that might rea-

sonably have been undertaken even if the only claim in that lawsuit had been Jacobson's slander cause of action but that also clearly would have been undertaken, given the many other (uncovered) claims and cross-claims in that suit, even if Jacobson's cross-action had *not* included the slander claim. For example, in depositions counsel sought some information from witnesses about their general background and about their connection to or roles in the Fairways construction project that counsel might well have sought *either* if the only cause of action in the litigation had been the covered slander claim *or* if the case had included *only* the uncovered contract and business tort causes of action. The issue we address in this subsection is: in the specific factual setting of the underlying state court litigation in the case at bar, is Homestead entitled to reimbursement for all the litigation activity that its counsel might reasonably have undertaken if the case had involved only the slander cause of action, or should Scottsdale not be obliged to reimburse Homestead for those litigation activities that Homestead's lawyers clearly would have felt constrained to undertake in prosecuting and/or defending against all the other, uncovered causes of action, even if Jacobson had never even intimated that he might pursue the cause of action based on slander?

In the paragraphs that follow we develop a recommendation for Judge Armstrong on this issue, but because this is a sensitive matter about which reasonable people could disagree and on which we have no clear guidance from California courts, we will provide the District Court with findings on both of the two alternative theories. Thus, in a subsequent section, we will give Judge Armstrong two dollar amounts from which to choose: one based

---

there was no evidence of breach of duty to defend. Although *Bertero* was a malicious prosecution case that did not involve disputes about a duty to defend, it expressly distinguished the allocation burden from *Hogan* on the wrongful breach of the defense obligation: "The insurer [in *Hogan* ] had a preexisting duty at least to initiate a defense, and, *because of its breach* it was required to assume the heavier burden of

establishing a proper allocation between litigation expenses incurred by the insured in defending against claims which were covered by the policy and those which were not. Defendants in the instant circumstances had no preexisting responsibility for Bertero's attorney fees." *Id.* at 63, 118 Cal.Rptr. 184, 529 P.2d 608, emphasis added.

on the narrower entitlement theory (the view that we believe California courts would endorse) and a second amount based on the broader theory.

Why have we concluded that California courts would hold Scottsdale liable, in the setting here presented, only for those litigation activities that would not have been undertaken on Homestead's behalf but for the presence of the slander cause of action? In considering this matter, our first task was to look carefully at all of the arguably relevant articulations of law from California courts. Unfortunately, this effort yielded no meaningful guidance. No opinion from a California court that we have been able to find even acknowledges that the issue we address here exists.

That fact may be attributable to the specific character of the cases which have given rise to the development of most of the California law in this general area. The California cases that have generated the most expansive articulations of the scope of the duty to defend seem to fall into two categories: (1) those in which a plaintiff alleges a common core of facts or events and then asserts that these same core facts, perhaps with modest variations, give rise to rights to relief under several different legal theories, some of which (e.g., negligence) would trigger coverage and others of which (e.g., intentional deceptions) would not [11], and (2) those in which a plaintiff alleges a set of densely intertwined facts that defendants deny, where coverage would attach if some of the facts were true but not if only others were true, and thus where it is impossible to know whether coverage exists until the jury or judge, after trial on the merits, determines which facts the plaintiff has proved.[12] The decisions by California courts (and federal courts interpreting California law) to construe the duty to defend broadly in these two kinds of situations certainly is understandable; that approach apparently has

been necessary to protect policy holders against unjustifiably narrow, self-serving interpretations of insurance policies by the carriers who wrote them.

We have found no California case, however, where the underlying litigation is similar to the case at bar. Thus no California court has had occasion, at least in a reported opinion, to consider whether an expansive application of the duty to defend is justified in a setting like ours. This is important because we believe that the courts could justify the broader of the two alternative approaches that we are considering here *only* if they could identify a principled basis for adopting, in a setting like this, an expansive construction of the duty to defend. We perceive no such justification. As noted above, Judge Jensen already has concluded that Scottsdale breached no duty to Homestead. Scottsdale's handling of Homestead's claims posed no threat to the policy goals of encouraging carriers to resolve reasonable doubts about the scope of the duty to defend in favor of the insured.

Moreover, we believe that the equities of the underlying situation here, as more fully explicated in the findings of fact in the sections that follow, clearly favor confining Scottsdale's responsibility to those litigation expenses that were occasioned only by the slander claim. Homestead *initiated* the underlying litigation. Its suit against Jacobson obviously did not even arguably trigger any duty in Scottsdale under the subject policy. Six months later Jacobson filed a cross-complaint that did not include a covered cause of action. Then more than two years elapsed without Homestead or its counsel (in house or retained) even suggesting that the Scottsdale policy covered any aspect of the litigation. It wasn't until the spring of 1990, almost three years after it had initiated the case, that Homestead began claiming that discovery had exposed

11. *See, e.g., Gray v. Zurich Ins. Co.,* 65 Cal.2d 263, 54 Cal.Rptr. 104, 419 P.2d 168 (1966) and *Royal Globe Ins. Co. v. Whitaker,* 181 Cal.App.3d 532, 226 Cal.Rptr. 435 (1986).

12. *See, e.g., Hogan v. Midland National Ins. Co.,* 3 Cal.3d 553, 91 Cal.Rptr. 153, 476 P.2d 825 (1970); *St. Paul Fire and Marine Ins. Co. v. Sears, Roebuck & Co.,* 603 F.2d 780 (9th Cir. 1979); and *Gon v. First State Ins. Co.,* 871 F.2d 863 (9th Cir.1989).

a possible defamation cause of action that would trigger coverage.

Most important, even after Jacobson formally added the one slander cause of action in June of 1990, our extensive examination of records from the state court action, of time sheets/billing memoranda prepared by Homestead's counsel, and of the declarations submitted by lawyers in that litigation leave us with no doubt that the underlying litigation was thoroughly dominated throughout by the *uncovered* breach of contract and business tort causes of action. Those causes of action were real and substantial. They were litigated vigorously both before and after the slander claim surfaced, and it is abundantly clear that they would have been so litigated even if Jacobson never had made any allegations sounding in defamation. For reasons we detail *infra*, we have concluded that it was the contract and business tort claims that really drove the litigation from the beginning to the end; the momentum from those claims clearly was sufficient (and would have been without the slander claim) to compel counsel for Homestead to undertake the vast majority of the activity that they undertook in the litigation. In sum, it is clear that the center of litigation gravity always was the uncovered contract and business tort claims and that the only covered claim (slander) played a satellite role. In a setting like this, we do not see how it could be equitable to make the carrier pay for litigation expenses that Homestead clearly would have incurred, even if Jacobson never had added the covered slander claim, as it litigated the dominating uncovered claims.

There is an additional policy consideration that cuts in the same direction. We are troubled by the fact that from the moment the possible defamation exposure surfaced, even though the case already was almost three years old and obviously centered around significant contract and business tort claims that clearly were not covered under the policy and that had little to do with the slander cause of action, Homestead attempted to press Scottsdale to pay the *entire* cost of litigating Jacobson's multi-count cross-complaint. A sophisticated institutional litigant like Homestead, assisted by presumptively able counsel, simply could not reasonably have believed that the premiums it had paid entitled it to such broad benefits. We find it most difficult to believe that Homestead and its lawyers really had an expectation that Homestead's premiums were buying protection against so many uncovered risks. So we are concerned that Homestead may have seen the emergence of the one covered claim as an opportunity to secure a financial windfall (by pressing the carrier to bear the considerable expenses generated in litigating the contract and business tort aspects of the case). Our concern about this possibility is heightened by the fact that despite Scottsdale's requests, Homestead's lawyers refused even to try to keep separate accounts of the expenses attributable to the slander claim.

These matters are relevant to the issue we address in this section because the courts should adopt rules that encourage parties to take reasoned and responsible positions and not to over-reach or strain in attempts to secure benefits for which they never bargained. We fear that we would be encouraging over-reaching by sophisticated insureds if we were to endorse Homestead's broader entitlement theory in a setting like this, where the uncovered causes of action clearly dominated the underlying case and clearly would have resulted in the insured incurring the vast majority of the litigation expenses for which it seeks reimbursement.

We understand that California law has recognized, in this arena, two competing realities: (1) carriers sometimes construe insurance policies in selfish, unjustifiable ways, attempting to take advantage of the naivete of insureds and doing violence to their reasonable expectations, and (2) insureds and their lawyers sometimes attempt to distort the reach of specific insurance policies in order to secure access to benefits or protections for which they could not have had a reasonable expectation. In the specific setting of this case, where the district court already has concluded that the carrier breached no duty to the insured,

and where the underlying action was so clearly dominated by uncovered causes of action, the narrower entitlement theory that we recommend should help reduce the second of the two problems described above while not exacerbating the first.

For all the reasons set forth in the preceding paragraphs, we conclude that California courts should and would endorse the view that in cases where *uncovered* claims clearly dominated the underlying litigation, the carrier should be responsible only for those litigation expenses that its insured would not have incurred but for the presence of the covered claim. Thus we recommend that Scottsdale not be deemed responsible for expenses that Homestead would have incurred if the slander claim never had surfaced, even if those same expenses might well have been generated in a case that consisted solely of the slander cause of action.

### C. Is Scottsdale Liable for Any Litigation Expenses Incurred Before Homestead Made Its Tender?

■ Homestead contends that expenses generated by the Weintraub firm from March 1, 1990, about the time that more specific evidence that could support a slander cause of action began to surface through the discovery process, to the date the tender letter was written, March 26, 1990, should be included in the allocation. We disagree.

The Homestead–Scottsdale contract has a voluntary payment/tender provision, which prohibits Homestead from voluntarily incurring expenses relating to a claim prior to tendering the claim to Scottsdale.[13] This kind of tender requirement is a standard provision in insurance contracts. One of its primary purposes is to give carriers an opportunity to control the costs that they ultimately will be responsible to pay. While the cases that address these matters are not numerous, it appears that Califor-

nia courts have concluded that these kinds of provisions are enforceable except in unusual cases where compelling circumstances would make it unfair to do so. See, e.g., *Gribaldo, Jacobs, Jones and Associates v. Agrippina Versicherunges A.G.*, 3 Cal.3d 434, 448–49, 91 Cal.Rptr. 6, 476 P.2d 406 (1970) and *Northern Insurance Company v. Allied Mutual Insurance Company*, 955 F.2d 1353 (9th Cir. 1992).

The most important recent California case that might have involved such compelling circumstances is *Fiorito v. Superior Court*, 226 Cal.App.3d 433, 277 Cal.Rptr. 27 (1990). Homestead argues that *Fiorito* compels us to conclude that Homestead is entitled to pre-tender fees in this action. We disagree. The Court of Appeals in that case decided only that "recovery of pre-tender expenses should [not] be denied in all cases as a matter of law" [14] and that the insureds had alleged sufficient facts in their pleadings to make triable the issue of whether the pre-tender expenses they incurred were indeed "voluntary" within a reasonable meaning of that word as used in the applicable policy. The insureds in that case, who were simply private citizens sued for allegedly failing to disclose defects in the home they sold, claimed that they had received no notice that their insurance company would not pay reasonable pre-tender expenses, that they had had trouble finding their insurance policies, that they were required by law to respond to the underlying litigation before they found their policies, and that they made their tender shortly after the policies were located. The Court of Appeals ruled that if all this were true, there would be a triable issue as to whether the pre-tender expenses they incurred were "voluntary".

Homestead's situation in the case at bar is radically different. Unlike the Fioritos, Homestead is a major financial institution with sophisticated counsel. Homestead has

---

**13.** The relevant provision in the policy states: "The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation, or incur any expense other than for first aid to others at the time of accident." A copy of the contract is attached as Exhibit D to the Declaration of John A. Belcher, filed December 6, 1991.

**14.** *Id.*, at 439, 277 Cal.Rptr. 27.

made no claim that it could not locate its insurance policies between March 1 and March 26, 1990. Nor has Homestead claimed that it had no notice that the relevant insurance policy excluded coverage for pre-tender expenses. Instead, Homestead has suggested that its pre-tender expenses should be deemed "involuntary" because its counsel was so busy during this period that it could not find time to write the tender letter and because Homestead anticipated that Scottsdale would reject the tender even if made, in part because Jacobson had not yet formally amended his pleading to add a slander cause of action.

These arguments are not persuasive. First, Homestead admits that the basis for the slander claim surfaced clearly during the deposition of Marty McGinnis on March 6 and 7, 1990. While it is clear that there was considerable activity in the underlying case during the remainder of March, it is not at all clear why one of Homestead's many counsel (either in-house or from the Weintraub *firm*) could not spend an extra hour some evening, e.g., on March 7, 1990, writing the tender letter. In addition, we note that Homestead has failed to explain why, if it needed time to draft a tender letter before incurring additional expenses, it could not have sought a one-day stay in the discovery or other pretrial activities to do so. Surely good lawyers are capable of thinking of that option.

Nor can Homestead excuse its delay in making the tender on the ground that it expected to be rebuffed by Scottsdale. Apparently Homestead had that same expectation on March 26th, but nonetheless wrote the tender letter on that date. Moreover, as a sophisticated, well-counselled institution, Homestead is chargeable with knowledge that its obligation to make the tender is (and must be) independent of any anticipation about what Scottsdale's response might be, and that it was only by making the tender that Homestead could start the clock running on Scottsdale's potential liability. It is noteworthy, as an

aside, that while Scottsdale at first rejected the tender, it subsequently agreed to fund the defense of the slander claim from the date of tender, not from the later date on which Jacobson amended his cross-complaint to include the one covered claim.

On these facts, so different from those alleged in *Fiorito*, we cannot find that Homestead "involuntarily" incurred expenses between March 1 and March 26. Perceiving no other reasonably arguable ground for refusing to enforce the voluntary payment/tender provision in the insurance contract, we recommend that the district court decline to order Scottsdale to reimburse Homestead for any of the expenses in incurred before March 26, 1990.[15]

### D. Should Scottsdale Be Liable For Some or All of the Fees Generated by the Weintraub Firm After It Formally Withdrew As Homestead's Counsel in the Underlying Action?

■ Scottsdale contends that it should not be liable for any portion of the fees generated by the Weintraub firm after it withdrew from the litigation in November of 1990 as the result of an emergent *Cumis* problem. We disagree. We recommend that the apportionment formula that we develop in a subsequent section be applied to those reasonable post-withdrawal fees that Weintraub generated in order to effect the kind of orderly transition of the case to new counsel that would protect adequately Homestead's interests.

The Weintraub firm could not protect its client's interests by withdrawing and then doing nothing to help get the files to new counsel or to educate them about how materials were organized, how the case had been handled, and where it seemed to be going. These are kinds of expenses by which parties to an insurance contract like this should not be surprised and which the insured could reasonably expect to fall within the coverage of its policy. Conflicts of interest that result in a need to change

---

**15.** Given the fact that there is inevitably a modest level of imprecision in the allocation formula that we develop later in this opinion, it is not necessary to decide whether the tender was effective on March 26th, the date the insured sent the tender letter, or March 27th, the date the carrier received it.

counsel occur with sufficient frequency, especially in large, multi-party litigation like this, to make these kinds of expenses reasonably foreseeable. Thus we recommend that fees for services reasonably necessary to transfer the case to new counsel be subject to the allocation we undertake below.

■ We note, however, that not all of Weintraub's post-withdrawal bills reflect activity that fits into this category. According to the Weintraub invoices, most of the charges after March 12, 1991, relate to the declaratory relief action in this court between Scottsdale and Homestead, not to litigating the underlying state court matter with Jacobson. Homestead has failed to show that there is a contractual basis for ordering Scottsdale to pay fees incurred during the coverage litigation. Scottsdale's policy commits it to fund the defense of certain claims by third parties against Homestead; we are not aware of provisions in that policy that commit Scottsdale to pay the expenses its insured incurs when litigating against Scottsdale the scope of the policy's coverage. California courts generally appear to have concluded that an insured is not entitled to attorney's fees and costs stemming from a separate action seeking reimbursement from the carrier after tender of a defense was rejected. *Carroll v. Hanover Ins. Co.*, 266 Cal.App.2d 47, 50–51, 71 Cal.Rptr. 868 (1968); *Cathay Mortuary Inc. v. United Pacific Ins. Co.*, 582 F.Supp. 650, 660 (N.D.Cal.1984) (interpreting California law). Given this state of the law, we have excluded from the allocation we make below all post-withdrawal charges by the Weintraub firm that are attributable to the coverage dispute and not to equipping new counsel to adequately protect Homestead's interests in the underlying litigation with Jacobson.

### E. Should Fees Generated by the Hoge, Fenton Firm After the Weintraub Withdrawal Be Subject to the Allocation?

■ Homestead contends that the services of Hoge, Fenton were necessary to a reasonable defense of the covered slander claim, and, therefore, that the fees generated by that firm should be included in the allocation. Scottsdale, however, maintains that after the Weintraub withdrawal HLDC's separate interests were adequately represented by Donahue & Callaham, and, therefore, that Scottsdale is not required to pay for services of another firm. Homestead insists that Donahue & Callaham were primarily interested in protecting Scottsdale's interests, which were in tension with the interests of its insured, and, therefore, that under *San Diego Federal Credit Union v. Cumis Insurance Society, Inc.*, 162 Cal.App.3d 358, 208 Cal.Rptr. 494 (1984) and California Insurance Code § 2860, Homestead was entitled to representation by separate counsel at Scottsdale's expense. Scottsdale counters that the firm of Donahue & Callaham was *Cumis* counsel, and that Scottsdale has no obligation to absorb the costs of two sets of *Cumis* lawyers. For reasons set forth in the paragraphs that follow, we have relied on principles of equitable estoppel in concluding that Scottsdale is liable under its policy for that portion of the Hoge, Fenton charges that is reasonable attributable to defense of the slander cause of action. Consequently, we need not resolve the parties dispute about whether Donahue & Callaham were sufficiently independent of Scottsdale and sufficiently committed to Homestead to satisfy the requirements of *Cumis* and its progeny.[16]

**16.** The status of Donahue & Callaham's representation is unclear under the submitted evidence. On the one hand, Homestead's counsel, Paul H. Cyril, in a January 8, 1991 letter to Scottsdale's attorney John A. Belcher, stated that Homestead was "desirous of having Mr. Donahue's representation" notwithstanding any reservations of Homestead's rights. See Exhibit A to the Declaration of John A. Belcher filed December 6, 1991. We also note that, under directions from Homestead, Donahue refused to turn over information relating to the underlying litigation to Scottsdale. See Declaration of John A. Belcher filed December 6, 1991, ¶ 21. And it appears that the Donahue lawyers freely delivered files to and shared information with Hoge, Fenton after HLDC retained the latter firm.

On the other hand, Homestead points to an incident in which Erwin Adler, an attorney representing Scottsdale, assisted in editing a summary judgment motion in the Donahue offices.

We have found no evidence that Scottsdale expressly approved of Hoge, Fenton's representation, as formally required by the insurance contract.[17] It is quite clear, however, that Scottsdale had prompt actual notice that HLDC had engaged Hoge, Fenton to serve in the role from which the Weintraub firm was compelled to withdraw. See, e.g., Declaration of Thomas HR Denver and attached Exhibits, filed February 19, 1992. In mid-April 1991, Hoge, Fenton notified Scottsdale in writing that it was representing HLDC in the Jacobson litigation. *Id.* Scottsdale responded by indicating that it was not at that time granting permission to Hoge, Fenton to assume responsibility for the defense of HLDC but requesting that lead counsel, Thomas HR Denver, answer questions relating to his qualifications. *Id.* Denver promptly complied with the request. *Id.* Thereafter, neither Hoge, Fenton nor HLDC received any communication from the insurance company indicating that it had any further questions about or objections to Hoge, Fenton doing the lawyering in the case for HLDC that obviously had to be done by someone. Given the fact that Scottsdale obviously knew that the litigation was proceeding, it is inconceivable that Scottsdale did not know full well that Hoge, Fenton had in fact substituted in for Weintraub.

Most significantly, Scottsdale, despite this clear knowledge, did not communicate to either Homestead or Hoge, Fenton that Scottsdale would refuse to pay fees generated by Hoge, Fenton in defense of the covered cause of action. Scottsdale did not even purport to order Hoge, Fenton off the case and took no steps (of which we are aware) to assure that the Donahue firm

rather than Hoge, Fenton played the lead role in litigating and settling any part of the Jacobson cross-claim. In this setting, it was reasonable for both HLDC and Hoge, Fenton to infer that Scottsdale tacitly had approved of the representation by Hoge, Fenton. HLDC and Hoge, Fenton proceeded in reliance on that reasonable inference, and did so in circumstances in which Scottsdale clearly could have taken steps to protect any interests of its that it might have perceived as being compromised. Because Scottsdale failed to take any such steps, it should be estopped from complaining now.

■ Scottsdale further argues that Hoge, Fenton's fees should be excluded from the allocation because they are duplicative and wasteful. Scottsdale failed to submit evidence that the work done by the two firms was in fact duplicative and wasteful. It appears that the Donahue people remained relatively passive and that the Hoge, Fenton lawyers did virtually all of the front line work. Thus it is likely that Scottsdale received benefit from Hoge, Fenton's representation of HLDC because Hoge, Fenton performed work that Donahue and Callaham otherwise would have been compelled to perform. In addition, because Hoge, Fenton had represented two entities related to HLDC in the state court proceedings (Homestead Financial and Homestead Savings and Loan), and had just completed successful settlement negotiations on their behalf, the Hoge, Fenton lawyers brought considerable knowledge of the case with them, thus avoiding the learning curve costs that would have been occasioned by bringing in counsel who were not familiar with the case. Thus it appears that Scottsdale benefitted in at least two ways from Hoge, Fenton's work.

---

See Declaration of Eric Lonnquist filed January 10, 1992, ¶ 6. Homestead also has submitted correspondence that suggests that Donahue & Callaham might have kept Scottsdale better informed than Homestead about developments in the litigation. See letters attached to Declaration of Eric Lonnquist filed January 10, 1992, ¶ 6–8.

**17.** Scottsdale argues that an insurer may reject its insured's selection of independent counsel if such a rejection is reasonable. *Cf. Center*

*Found. v. Chicago Ins. Co.,* 227 Cal.App.3d 547, 560–61, 278 Cal.Rptr. 13 (1991) (reversing a summary judgment that an insurer had breached its duty to defend by not approving inexperienced counsel that posed potential conflicts).

We do not find *Center Foundation* relevant to the present dispute. *Center Foundation* was concerned with the unethical billing practices and costs caused by inexperienced and incompetent lawyers. Scottsdale does not contend that Hoge, Fenton was unqualified, and we find no evidence of unethical billing practices.

Having thus benefitted, and having made no timely protest, Scottsdale has waived whatever right it might otherwise have had to reject HLDC's hiring of Hoge, Fenton after Weintraub was forced to withdraw.

### F. Should Scottsdale Be Liable For Time Allegedly Devoted to the Jacobson Litigation by Lewis J. Soffer?

■ Homestead claims that work related to the Jacobson action that was performed by Lewis Soffer should be subject to the allocation we make below. Mr. Soffer was Homestead's in-house counsel during the period covered by most of the Jacobson litigation. Late in that period he left Homestead to join the Oakland firms of Miller, Star & Regalia. He allegedly committed considerable time to the state court action while he was Homestead's corporate counsel. In addition, he purported to bill just over $2,000 to the Jacobson litigation after he joined the Miller, Star firm.

Scottsdale contends that the insurance contract expressly prohibits such charges.[18] Homestead counters that the language of the insurance contract is not controlling because Scottsdale wrongfully breached that contract.

Homestead's argument, however, ignores the law of the case: Judge Jensen already has found that Scottsdale did not breach its contract. *Order* of August 1, 1991. Thus we see no reason why the insurance contract should not control. The cooperation clause in that contract is a standard provision under which the insured promises that its employees will render, without charge, any assistance that is reasonably necessary to litigating a covered claim.[19] Homestead has cited no authority for the proposition that this clause is some-

how inoperative when the insured's employee happens to be a lawyer. Nor has Homestead pointed to any understanding reached by Homestead and Scottsdale that would alter the plain meaning of the language of the cooperation clause. Moreover, Homestead has not even contended that it sought permission from Scottsdale to use Mr. Soffer's services as a supplement to the work being done by the Weintraub and then by the Hoge, Fenton firms, or that it felt that such supplementation was necessary because the lawyers it had retained were not adequately representing its interests. Finally, we have seen no evidence that Mr. Soffer kept track of the time he devoted to the Jacobson litigation while he was employed at Homestead; his apparent failure to keep such time records belies the suggestion, apparently made for the first time well after the fact, that either he or Homestead had an expectation that the carrier would fund that part of his work that was related to the state court litigation.

Nor is Soffer's work while employed at Miller, Starr & Regalia compensable. HLDC already was adequately represented by other counsel at this time, and the insurance contract required Scottsdale's approval for extra expenses. We find no evidence that Homestead sought or that Scottsdale gave any such approval. Scottsdale should not be responsible for any portion of these fees, and we do not include them in the allocation.

### IV. DETERMINING THE APPROPRIATE ALLOCATION PERCENTAGE

■ The recommended rulings in the previous sections define the universe of fees and costs from which the allocation for the one covered cause of action (slan-

---

18. The relevant provision in the insurance contract states:
 "The insured shall at all times
 (a) give to the [insurance] Company or their duly appointed representatives such information, assistance, and signed statements as the Company may require, and
 (b) assist in the defense of any claim without charge to the Company."
 The contract is attached as Exhibit B to the Declaration of John A. Belcher, filed December 6, 1991.

19. We also note that since Soffer did not keep track of the time he committed to the underlying litigation, did not "bill" for it, and did not even provide us with information about how he was compensated when he served as General Counsel, we could not begin to make a fair allocation even if we thought that Scottsdale was obligated to reimburse Homestead for the cost of some of Soffer's work.

der) will be made. In the paragraphs that follow we report findings and describe the reasoning on which we base our conclusion about what percentage of this universe (i.e., of the total litigation costs that remain after application of the rulings above) is fairly attributable to the slander claim. As indicated, we will provide two figures: one (smaller percentage of the whole) to be applied if the district court agrees with our recommendation that the allocation include only those fees and costs that would not have been incurred but for the presence of the covered cause of action, and a second (larger percentage of the whole) that would be applied if Judge Armstrong concludes that Homestead should be entitled to reimbursement for all the expenses that reasonably would have been incurred in a suit in which the only cause of action was the slander claim.

We build our recommendation about the appropriate allocation percentage from four bases: (1) the structure of the case as a whole, and the place therein of the one covered cause of action, viewed primarily through the pleadings; (2) the discovery, motion, and settlement records from the state court action that counsel have provided us, e.g., deposition summaries, responses to interrogatories, legal memoranda, and settlement conference statements; (3) the time sheets/billing records from the Weintraub and the Hoge, Fenton firms; and (4) the declarations from counsel that have been submitted in connection with this allocation proceeding.

### A. The Structure of the Case.

As we noted in Section II, above, it was Homestead, not Jacobson, that filed the complaint that initiated the state court proceedings. That complaint, filed on May 10, 1987, included seven different causes of action: breach of contract, money had and received, fraud, misrepresentation, negligence, an action on Jacobson's surety bond, and a claim for indemnification. Homestead prayed for some $300,000 in compensatory damages and another half a million dollars in punitive damages. During the

period to which we have decided the allocation should apply in this Declaratory Relief action, i.e., from March 26th or 27th of 1990 through the conclusion (by settlement) of the state court action late in the summer of 1991, Homestead continued to litigate (through the Weintraub and then the Hoge, Fenton firms) its offensive claims against Jacobson. At least as late as March 11, 1991, in a settlement conference statement prepared on its behalf by the Donahue firm, Homestead insisted that its affirmative case against Jacobson was worth $386,000, not counting its claim for punitive damages. See Homestead's Settlement Conference Statement, at page 10, attached to Scottsdale's Reply Brief as Exhibit B. Homestead concedes that the work done by Weintraub and Hoge, Fenton on its offensive claims should result in some reduction in the total charges its counsel submitted for the period that is subject to this allocation, but Homestead also argues that that reduction should be quite modest ($45,738.00 [20] from a total of $542,010.29) because there was so much evidentiary interdependence between its offensive claims and Jacobson's cross-claims.

The difficulty with Homestead's argument is that it proceeds from a premise we reject, namely, that there also was an inextricable and comprehensive evidentiary interdependence between the one covered cause of action (the specific alleged slander that Jacobson would go to jail for tax fraud) and all the other causes of action that Jacobson asserted against Homestead in his amended cross-complaint. Those other causes of action sounded essentially in breach of contract and business tort theories, the same kinds of theories, generally, that were presented in Homestead's original complaint. Thus, while it is clear that there was considerable evidentiary interdependence between Homestead's complaint and many of the contract and business tort causes of action in Jacobson's amended cross-complaint, it is equally clear that there was precious little such interdependence between the slander cause of action and the remainder of the case.

---

**20.** Declaration of Roger A. Brown, filed January 10, 1992, paragraphs 44 and 45.

We base this conclusion on many different grounds, beginning first with the pleadings. It is significant that Jacobson did not even intimate in the one slander cause of action against Homestead that the allegedly defamatory words ruined his business, cost him business opportunities, or played any role in alleged breaches of the contractual obligations running to him. He did not even incorporate by reference in the slander cause of action the allegations from other claims in his amended pleading. Thus Jacobson's counsel never formally alleged that there was a causal connection between the slander cause of action and the contract and business tort aspects of the case.

Nowhere else in the 33 page amended complaint did Jacobson allege that defendants uttered words about him that were actionable as slander. In five other places, however, as the final entry in a canned list of 12 allegations which he reasserted verbatim as parts of what purported to be five different causes of action sounding generally in contract and business tort theories, Jacobson included an opaque allegation that Homestead had made unspecified "disparaging remarks regarding JACOBSON to JACOBSON's workers, other contractors, material suppliers and governmental and business entities." *Id.*, at 6, 10, 18, 21 and 28). The vast majority of the alleged acts included in the canned 12–item list of alleged wrongs by Homestead consisted of direct breaches of the underlying contractual obligations running from Homestead as the developer to Jacobson as the general contractor (e.g., failing to pay sums due under the contract, interfering with Jacobson's performance of the contract, failing to make contractual payments on time, etc.). Given the character of the five causes of action in which this canned list of wrongs appeared (purporting to sound only in breach of contract or business tort theories, not in defamation), the character of the vast majority of the acts on this list (alleged breaches of contractual obligations), the fact that the only reference to something even arguably related to defamation was last on the list, that in making this last allegation Jacobson did not identify the words allegedly used and, significantly, did not even claim that they were defamatory, and that there was a separate cause of action which quite explicitly sounded in defamation and which set forth the exact words allegedly used, a reasonable lawyer would have viewed the allegation of "disparaging remarks" as a throwin that was not likely to play a significant role in Jacobson's ability to prove the essentials of any of these other causes of action.

It also is significant that for part of the period that is subject to this allocation, the litigation between Canfor and Jacobson continued, litigation that was not related to the slander cause of action pressed by Jacobson against Homestead, but that overlapped considerably with the contract and business tort aspects of the suits between Homestead and Jacobson (and that had been consolidated with those matters). Thus Homestead's counsel reasonably felt constrained to keep abreast of activities in the Canfor suit and to attend depositions noticed in connection with that matter. Bills from the Weintraub firm show that in March and April of 1990 it sent lawyers to the depositions of Ewy, Unruh, Yribar, and Ray, all of which apparently were noticed in the Canfor matter. These continuing disputes between Canfor and Jacobson diluted even further the role in the overall litigation drama played by the slander claim against Homestead.

Summarizing the structure of the case during the relevant time period, we see: (1) Homestead prosecuting seven causes of action against Jacobson, none of which have any apparent connection with any alleged defamation, (2) Homestead defending 10 causes of action that Jacobson was pressing against it, only one of which (slander) implicated Scottsdale's duty to defend; and (3) Homestead's counsel having to monitor closely both the development of the suit Canfor pressed against Jacobson and of the three cross-claims Jacobson had pled against Canfor. Even taking into account the partial evidentiary overlap between some of Jacobson's different causes of action against Homestead, as well as the

partial overlap between some of Homestead's offensive claims against Jacobson and some of his claims against Homestead, the structure of the case as presented by the pleadings suggests that no more than 10% of the lawyering activity on behalf of Homestead could fairly be attributed to defense of the slander cause of action.

## B. The Discovery, Motion, and Settlement Records from the State Court Action.

The second set of evidentiary materials from which we build our recommendation about the percentage of litigation expenses that should be allocated to the slander claim consists of the discovery, motion, and settlement records from the underlying state court action that counsel have provided us.

We note at the outset that counsel have not provided us with copies of much of the paper record from the state court action. A large number of depositions (at least 12 during the relevant period) were taken for which we have no transcript or summary.[21] Documents were produced that we have not seen. We infer that we have seen neither all the interrogatories and responses thereto nor all of the motions and memoranda that were filed.

Scottsdale advises us that it has searched the records to which it has had access for every arguable allusion to litigation activity that appeared to be connected with the slander cause of action and has brought each instance thereof to our attention. We have no basis for challenging this assertion. It seems reasonable to assume that Homestead would have brought directly to our attention, despite its protestations about the magnitude and location of the burden of proof in this setting, every document that would tend to suggest litigation activity related to the defense of the slander claim. Thus we infer that we have seen all of the direct documentary support

that can be mustered in favor of work done on the one covered cause of action. Given the clear fact that there was *much* activity in the case that is not reflected in the pretrial records that we have seen, we must infer that attention to the slander cause of action occupied an even smaller percentage of the case as a whole than is reflected in the documents that counsel have presented us.

### 1. Depositions.

As far as we have been able to tell, the alleged statements by a Homestead employee on which Jacobson subsequently based his cause of action for slander surfaced clearly for the first time in the underlying litigation during the deposition of Martin D. McGinnis on March 6 and 7, 1990. The transcript of that deposition runs to some 480 pages, only 12 of which arguably were related to explication of the slander cause of action. And of those 12 pages, only 6 appear to have been devoted expressly to the alleged slander; in the remaining 6 pages counsel explored the relationship between Jacobson and Cliff Seavey, the Homestead employee who allegedly said that Jacobson was going to jail for tax fraud. While it clearly would have been reasonable for counsel to explore that relationship in a search for motives for the alleged slander, counsel also likely would have felt the need to explore that relationship as part of the development of the uncovered contract and business tort aspects of the case. Thus it appears that only 6 of the 480 pages of this deposition (1.25%) covered material that needed to be addressed only because of the presence of the slander cause of action.

If the court were to adopt the broader entitlement theory, we would judge that all 12 of the pages could be attributed to development of the slander claim. We also would assume that if counsel were litigating a case that included only the slander

---

**21.** It appears from billing records that the following depositions were taken, for none of which we have received either a summary or a transcript: Mike Manfredi (date unclear), Mark Brownwell (April 13, 1990), Mark Blucher (April 26, 1990), Hutchens, Autrey and Green (all on April 27, 1990), Neil Bielsky and Bernard Miramon (both on April 30, 1990), Les Morganstern (on May 15 and May 17, 1990), Sue Adner and Nicole Merrick (both on July 15, 1990), and Mark Holley (July 17, 1990).

claim they might well have spent an additional 30 pages or so exploring this witnesses' general background and his relationships with both Jacobson and Seavey. Thus the allocation on the broader theory would be about 8%–10% (42–48 of the 480 pages).

Of the 16 other witnesses for whom we received deposition summaries or transcripts only five appear to have included any questioning at all that related to the slander cause of action. Seven of the sixteen witnesses (Ewy, Taggart, Unruh, Yribar, Peasha, Seavey, and Finch) were deposed during the first week of March 1990,[22] but before the McGinnis testimony exposed the potential slander. Thus the absence of any questions in them about the slander claim is understandable. So for purposes of helping determine what the allocation percentage should be, we focus on the 9 witnesses who were deposed in whole or in part after the basis for the slander claim surfaced. The purpose of the inquiry we undertake here is not to identify hours for which Homestead is entitled to reimbursement, because many of the hours involved in these depositions were spent before the tender letter was written on March 26, 1990. Rather, our goal is to get some additional leverage on the question of how large (or small) a role in the overall litigation the slander claim played after the basis for it surfaced in early March of 1990.

Four of the nine witnesses who were deposed during the relevant period and for whom we have summaries or transcripts were asked no questions at all about the slander claim. Four others were asked some questions that pretty clearly relate to the slander claim: Steve Casey, Scott Lewis, Dan Carter, and Karl Jacobson. Jacobson was deposed more than once over the long pretrial period, but we have information about only one 83 page portion of his pretrial testimony. With that caveat, the evidence that we have been presented shows that deposing the 9 witnesses we are considering here generated some 1,217 pages of transcripts, of which 32 (2.6%)

seem to have been directly related to the slander claim and another 30 indirectly related (the latter category includes questions about the relationship between Seavey and Jacobson). Thus it appears that between 3% and 6% of the depositions about which we have information were devoted directly or indirectly to the slander matter.

The vast majority of the questioning in these depositions related to the contract and business tort claims (how the project progressed, quality of workmanship and materials, costs incurred, progress payments, representations made by the various principal actors, problems interfering with movement toward completion, etc.) We note again that at least 12 additional depositions were taken after the evidence about the allegedly slanderous words first clearly surfaced but about which we have been presented no information. If we take those depositions into account, as we should, and if we assume that they included no questions obviously related to the slander claim, the percentage of the lawyering activity consumed by the slander claim would be even smaller.

The status of the discovery from Clifford Seavey warrants separate comment. He was deposed on February 27th and then again on March 2, 1990, about a week before McGinnis testified that he had said that Jacobson was going to jail for tax fraud. Seavey was asked during his deposition about the termination of Jacobson, but apparently not about any alleged slander. Very surprisingly, we have been given no evidence that suggests the Seavey was ever re-deposed. If our inference that he was not re-deposed is correct, and that he was never questioned on the record about his allegedly defamatory words, that fact would appear to be wholly inconsistent with the theory, so vigorously pressed here by Homestead, that Seavey's slanderous comments dominated Jacobson's approach to the entire underlying case.

We also think it noteworthy that there appears to have been no meaningful exploration of the slander claim in two of the

---

**22.** Clifford Seavey was deposed on February 27 and March 2, 1990.

other depositions (of which we have a summary or a transcript) where one might have expected counsel to address these matters if they had in fact played the central role alleged by Homestead. The summary of the deposition of Donald L. Dean, taken April 3, 1990, well after the specific basis for the slander claim had been exposed, contains no reference to the slander matter at all. This appears significant because Mr. Dean was a general superintendent of the Fairways project for HLDC. His 126 page deposition focused exclusively on contract issues and Jacobson's job performance. The transcript of the deposition of plaintiff's damages expert, David Schultze, also is illuminating. As we explain in some detail in our discussion, below, of the evidence submitted to us in the form of declarations, Schultze alluded during his deposition to arguably defamatory statements only in the most general of ways and only once. Transcript of Schultze depo., taken May 14, 1990, at p. 122, attached as Exhibit C to Scottsdale's Reply Brief, filed January 24, 1992. He clearly attributed Jacobson's lost-profit damages primarily to a lack of capital, which had essentially nothing to do with any alleged slander. His testimony, which obviously left the alleged defamation at the periphery of his view of causation, is wholly at odds with the suggestion that the slander cause of action played a major role in the lawsuit and was inextricably intertwined with the contract and business tort claims.

### 2. Interrogatories.

Counsel have presented us with four sets of interrogatories, three from HLDC to Jacobson and one from Jacobson to HLDC. All four sets were drafted and served well after the basis for the alleged slander appeared in early March of 1990. Not counting a great many subparts, there were 802 interrogatories in these four sets of questions. Construed generously (to Homestead), it appears to us that fewer than 40 of these questions (under 5%) were designed to explore, even indirectly, matters related to the alleged slander claim. Had Homestead been litigating only the slander claim, it might reasonably have served a few additional questions about damages, thus increasing the allocation percentage modestly if the broader allocation theory is used.

Interestingly, it appears that only 4 of the 254 interrogatories served by Jacobson related directly to the slander allegation. That tiny percentage (1.6%) again belies the assertion by Homestead that Jacobson and his counsel believed that the slander claim was the driving force in the litigation.

### 3. Legal memoranda and settlement conference statements.

Counsel also have presented us with two legal memoranda and two settlement conference statements, all prepared well after the basis for the slander claim surfaced. The first of the memoranda was presented by Homestead in support of its demurrer to Jacobson's cross-complaint. Of the 34 pages in this document, only one and one-half (4.4%) relate to the slander claim. Of the 59 pages in the memorandum Jacobson filed in opposition to the demurrer, only about 2 pages (3.4%) relate to the slander cause of action. There certainly is no evidence in this document that Jacobson's counsel felt that saving the slander claim was crucial to the value of his client's case.

Comparably instructive is the role played by the slander claim in the settlement conference statements presented to the state court in March of 1991. *Jacobson's lawyer* devoted less than one of the 28 pages (about 3%) of his statement to the slander claim. He certainly did not present that claim as the centerpiece of the litigation or the driving force in the settlement negotiations. Moreover, the 10 page settlement conference statement prepared by the Donahue firm (Weintraub had withdrawn and Hoge, Fenton had not yet assumed the representation of HLDC) for Homestead made no mention whatsoever of the slander claim. Instead, Homestead's settlement conference statement characterized Jacobson's claims entirely in terms of breach of contract and business tort theories: "[f]or his part, Jacobson claims he was substantially underpaid for the labor and materials he provided The Fairways and claims

HLDC breached the framing subcontract by failing to pay sums due, by interfering with his performance, by unjustifiably delaying periodic payments, by offsetting non-contractual work performed by Jacobson's employees, by misrepresenting that written change orders will be forthcoming after orally authorizing extra labor and work, by conspiring with others to terminate Jacobson's framing subcontract, and by otherwise refusing to perform." Exhibit B to Scottsdale's Reply Brief, filed January 24, 1992, at pages 4–5. Certainly there is nothing in this document that even hints at the notion that the slander claim would play any appreciable role in the settlement dynamic.[23]

*C. The Time Sheets/Billing Records from the Weintraub and the Hoge, Fenton Firms.*

As noted above, none of Homestead's lawyers attempted in their contemporaneous time sheets/billing records to separate out the charges that were attributable to the slander claim. Even though requested by Scottsdale to undertake such contemporaneous allocations, counsel for Homestead declined, in part on the ground that during certain periods the litigation was too frenetic (e.g., in the spring of 1990) and in part on the ground that the slander cause of action was too intertwined with other aspects of the case to make such an allocation feasible.

These decisions by Homestead's lawyers have left the court with billing records from which it is impossible to tell exactly how much time the lawyers devoted to litigating the slander claim. Most of the entries on the billing records do not refer to any substantive aspect of the case, but generally to processes or events, e.g., preparing for or attending depositions, reviewing discovery or memoranda, preparing motions, etc. Given the character of the bill-

ing records, it is not surprising that there are so few references to the slander claim. We found no explicit references to the slander claim at all in the billing records from the Hoge, Fenton office. Of the hundreds of entries in the Weintraub billing records we found only seven clear references to the slander claim. And in only two of these was slander the only subject of the billing; in the other five, the client was billed simultaneously, and without differentiation, for some undisclosed amount of work related to slander and for additional undisclosed amounts of work on other matters. Recognizing that precision in judgment on this kind of record is impossible, we infer that the total value of the time explicitly connected with work on the slander claim in the Weintraub bills was roughly $2,000 (less than half of one percent).

We do not mean to suggest by this that the Weintraub lawyers did no other work that is fairly allocable to the slander claim. Rather, we make two points: (1) the value of the slander related work that is directly reflected in the billing records the Weintraub lawyers have submitted is quite small ($2,000 of out total Weintraub billings in the relevant period of $415,369.53) and (2) there is nothing in these records, or in the bills from the Hoge, Fenton office, that undermines the inference suggested from other sources (e.g., pleadings, discovery, motion, and settlement records) that the slander claim in fact played a relatively minor role in the overall litigation drama.

*D. Declarations.*

Finally, we turn to the declarations that have been submitted by some of the attorneys involved in the underlying state court litigation: Roger A. Brown and Karen Boon of Weintraub; Thomas HR Denver of the Hoge, Fenton firm; Lewis Soffer (two declarations, one filed January 10, 1992 and

---

**23.** While we have not been required to make a finding in response to Homestead's assertion that the Donahue firm was not fully representing the interests of HLDC, but was instead taking its marching orders from Scottsdale and looking out in the first instance for the carrier's interests, we appreciate that there is some evidence to support this view (see, e.g., the Declara-

tion of G. Eric Lonnquist, filed January 10, 1992), and, by reason of that evidence, we have not permitted the absence of even an allusion to the slander cause of action from this settlement conference statement to play any appreciable role in our ultimate findings about what place that cause of action occupied in the underlying litigation.

the second filed February 19, 1992), G. Eric Lonnquist, and Paul Cyril, counsel for Homestead entities; and Steve Eggleston, Jacobson's attorney in the Fairways litigation. In the discussion that follows we focus on the declarations by Brown, Soffer, Denver, and Eggleston, as we perceive them as most significant for the task at hand.

Like many other aspects of this assignment, the declarations have presented us with many problems. They reflect mutually exclusive views of the underlying litigation. And there are severe tensions between some of the assertions in these declarations and the documentary records from the Homestead–Jacobson litigation. On the whole, however, we find the characterizations of the role of the slander cause of action that is presented by Steven Eggleston, counsel for Jacobson, most consistent with the evidentiary record and with our experience with the realities of multi-party, multi-count litigation like this, especially our experience with efforts by counsel to increase contributions toward settlement by insurance companies.

Eggleston, who now appears to have no interest in the dispute between Homestead and Scottsdale that might affect his recollections, is in the best position to know what his approach to the underlying litigation was and what drove Jacobson. Eggleston first became involved in the underlying litigation as a result of a dispute that had arisen in mid–1989 between Jacobson and his carrier, Travelers Insurance Company. Travelers wanted Jacobson to accept a "walk away" settlement offer from Homestead (meaning that neither party would receive any money from the other and both the complaint and cross-complaint would be dismissed). According to Eggleston, Jacobson refused to settle on these terms "because he claimed that he was still owed money by Homestead and had suffered substantial damages as a result of

his termination from the Fairways project and the wrongful attachment of his assets." [24] Roger Brown asserts that Jacobson had rejected this 1989 settlement proposal "in order to prosecute his [Jacobson's] slander claims." There are a couple of significant difficulties with this assertion by Mr. Brown. First, according to his own declaration, Brown was not assigned to the Homestead case until February 26, 1990,[25] and he has provided us with no reason to believe that he has any personal knowledge about why Jacobson refused the settlement offer made in mid–1989. Second, we are aware of no evidence that Jacobson even knew in 1989 that Seavey had uttered the allegedly slanderous words that served as the specific basis for the slander cause of action that Jacobson did not add to his cross-claim until mid–1990. By Brown's own account, "very little discovery had been done by Jacobson" before late February of 1990.[26] We think it likely that if Jacobson, who was not shy in litigation matters,[27] had known earlier about Seavey's alleged defamation, he would have made that knowledge apparent either by promptly seeking to amend his cross-complaint or at least by raising the matter rather clearly in the settlement negotiations that took place in 1989. The character of Jacobson's original cross-claim, and the fact that Jacobson had made only the vaguest of allusions to generally disparaging comments before the spring of 1990 suggests that he did not have knowledge of the specific alleged defamation until the deposition of Martin McGinnis on March 6 and 7, 1990, and that he had virtually no expectation in 1989 that a defamation claim would play a significant role in the outcome of the litigation. Thus we accept the Eggleston version of the settlement dynamic in 1989 rather than the Brown version.

Brown asserts that at some unspecified time (but apparently shortly after he began

24. Declaration of Steven Eggleston, filed January 24, 1992, paragraphs 5 and 22.

25. Declaration of Roger A. Brown, filed January 10, 1992, para. 7.

26. Id.

27. Homestead's counsel, while deposing David Schultze in the late spring of 1990, indicated that Jacobson was at that time attending law school. Transcript of deposition of David Schultze, taken May 14, 1990, at 135–36.

working on the case in late February of 1990) he renewed the offer to settle on a "walk away" basis but that *"Eggleston made it clear that it [sic] was not concerned about HLDC's Complaint, because the case would be tried on the slander claims."* (emphasis in original declaration, at para. 23) Brown proceeds to assert that "[b]ut for the presence of slander claims, there probably would have been a settlement" before the end of March, 1990.[28]

Eggleston denies that he ever told Brown that the case "would" be tried on the slander claims and denies that the slander claims were driving the litigation. Instead, Eggleston explains that he emphasized the slander claim in settlement conversations with Brown because he was concerned that HLDC would not contribute to settlement and wanted to create an environment in which counsel would be better able to "put pressure on the carriers and induce them to contribute to a settlement."[29] This explanation comports squarely with this court's experience in settlement negotiations in comparable settings.

Homestead further seeks to buttress its assertion that Eggleston viewed the case as driven or dominated by the slander claim by citing a letter that Eggleston had one of his associates, Robin K. Perkins, write to Erwin Adler, counsel for Scottsdale, on May 28, 1991 (more than a year after the Weintraub firm had withdrawn from the case). See Exhibit E to the Declaration of Thomas HR Denver, filed February 19, 1992. This letter purported to "clarify any possible misconceptions" that Scottsdale might have had about "the defamation claims." Perkins wrote that "[c]ontrary to your assertion that these claims represent a small portion of this action, the defamation claims are substantial and account for a significant portion of the damages attributable to your insureds." Perkins proceeded to assert that the slander included not only the allegation that Jacobson would go to jail for tax fraud, but also that he had embezzled money, diverted construction funds, and was not timely completing the work on the Fairways project.

Turning to the damages issues, Perkins waxed expansive, arguing that "the foreseeable results of this slander was [sic] the termination of the Homestead/Jacobson contract, the destruction of Jacobson's business, and Jacobson [sic] financial ruin." She added that a "substantial portion, if not all" of the $500,000 in lost profits that experts had testified that Jacobson had suffered "may be directly attributable to the slanderous statements made against Jacobson." *Id.*

This letter is the only piece of contemporaneous evidence that tends significantly to undercut Scottsdale's contention that the slander cause of action played a relatively minor role in the underlying litigation. The question we face is how much probative power to attach to it. Having considered the context in which it was written, and all the other contemporaneous evidence, we conclude that this letter reflects an intentional gross exaggeration of the role of the slander claim and thus that it should be given little evidentiary weight.

Significantly, this letter was directed not to opposing counsel, but to a lawyer representing Homestead's insurer, Scottsdale. It obviously was written as part of a settlement strategy, in order to pressure Scottsdale to commit more funds to settlement and to provide Scottsdale's lawyers with a rationale for recommending that such a greater contribution be made. Perkins' letter, which includes a thinly veiled threat of a bad faith suit, explicitly insists that the characterization of the case as set forth in the letter compels Scottsdale to accept "Jacobson's settlement demand." Moreover, the letter was written under Eggleston's direction, and his declaration persuasively explains that his assertion that "the defamation claim accounted for a significant portion of the damages against Homestead, was essentially tactical in nature and designed to pressure the insurance carriers

**28.** Declaration of Roger A. Brown, filed January 10, 1992, paragraphs 23 and 24.

**29.** Declaration of Steven Eggleston, filed January 24, 1992, paragraph 13; see also paragraphs 14, 15, and 22.

into contributing settlement money given Homestead's refusal to commit its own funds." Eggleston Declaration, filed January 24, 1992, para. 14. As we pointed out above, the settlement conference statement that *Eggleston* wrote on Jacobson's behalf less than three months earlier (and well after the alleged slander had been thoroughly explored in discovery) devoted *less than one* of 28 pages to the slander issues.[30]

We see clear evidence of the dimensions of the exaggeration in Perkins' letter when we focus on her discussion of the damages/causation issues. As noted above, she claimed that Jacobson had offered expert testimony that "a substantial portion, if not all" of $500,000[31] in lost profits was "directly attributable" to the alleged slander. We have reviewed the entire transcript of the deposition testimony by Jacobson's damages expert, David Schultze.[32] We note first that it is not at all clear that Schultze, as a CPA, was qualified to offer expert opinion about the *non-economic causes* of Jacobson's economic woes, especially about a cause as potentially elusive and unusual as slander. Second, Schultze never attempted to systematically identify, much less ascribe relative importance, to all of the factors that he believed had contributed to Jacobson's inability to pursue additional work. Third, and most significant, when he alluded to the causes as he understood them Schultze clearly *began with and emphasized most* "lack of capital," a condition he attributed in part to liens (one by Homestead) that had been placed on Jacobson's property and, primarily, to Homestead's failure to pay Jacobson for work on the Fairways project. See Schultze Depo. Tr., at pp. 119–122, then again at 132, where Schultze says in response to a direct question about which assumptions underlay his damages testimony that "I believe by the fact that they

[Homestead] did not pay him according to Schedule C put him in the position that he is currently in." These cash flow problems obviously arose directly and sufficiently from simple breach of contract claims; there clearly was no need to resort to such esoteria as defamation to explain them.

It also is·significant that in the only portion of his testimony, where Schultze alludes to negative statements about Jacobson contributing to his inability to get new work, he (Schultze) says nothing about the slander alleged in the amended cross-complaint but merely refers opaquely to "the fact that it was being talked about that Karl [Jacobson] was not paying his bills, that in fact he had now been terminated by Homestead in January...." Id., at 122. Of course it was true (and therefore not defamatory) that Jacobson had been terminated. It also was true, at least at some point, that he was not paying his bills. These kinds of statements fall far short of the specific slanderous words alleged in the amended cross-complaint (that "Jacobson was going to jail for tax fraud"), and it is not at all clear that they were defamatory.

Nowhere else in the 161 pages of his deposition does Schultze mention anything about matters even arguably defamatory. Thus we find that it is a gross distortion of what occurred at the Schultze deposition to suggest, as Perkins attempted in her letter to Scottsdale's counsel, that Jacobson had presented expert testimony that supported the view that "a substantial portion, if not all" of the lost profits being claimed by Jacobson could be directly attributed to the alleged slander.

For the reasons set forth in the immediately preceding paragraphs, we also reject as completely unfounded the following assertion in Roger A. Brown's Declaration: "Jacobson's damages expert, Mr. Schultze, made it very clear that the bulk of Jacobson's damages were based upon his theory

---

**30.** Exhibit A to Scottsdale's Reply Brief, filed January 24, 1992.

**31.** We note that while Perkins claimed that plaintiff's experts had testified that Jacobson had suffered $500,000 in lost profits as a result of Homestead's actions, in fact Schultze testified that Jacobson's lost profits amounted to $420,-

000. See summary of calculations attached at end of Schultze deposition transcript, which is Exhibit C to Scottsdale's Reply Brief, filed January 24, 1992.

**32.** Id.

that allegedly slanderous remarks made by Mr. Cliff Seavey (HLDC's Construction Supervisor) so severely damaged Jacobson's reputation that it ruined his business and nobody would hire him." How Brown, who took the Schultze deposition, could make any such claim completely escapes us. Schultze alluded vaguely to negative comments about Jacobson only once in 161 pages of deposition. Schultze never attributed the bulk of Jacobson's damages to any alleged slander. And he clearly emphasized lack of capital when he sought to explain Jacobson's inability to pursue additional work. This patent mischaracterization of his testimony is one of several reasons for our profound skepticism about the accuracy of much of Mr. Brown's Declaration.

Another ground for that skepticism is Mr. Brown's remarkable claim that "nearly all of the work Weintraub did on the case after July, 1989 was in defense of the slander claims." Again we note that Mr. Brown was not assigned this case until February 26, 1990.[33] Again we note that Homestead did not tender the matter to Scottsdale until March of 1990 because prior to that time there was no clear basis for any defamation cause of action. Again we note that there is no evidence that the subject of slander even indirectly surfaced in at least nine of the depositions that were taken in March and April of 1990.[34] It is indisputable that much of the discovery in the spring of 1990 focused on contract and business tort matters: the quality and timeliness of Jacobson's work, financial transactions connected with the materials he used (especially the lumber from Canfor), how HLDC handled payouts to Jacobson under the contract and why payments were not forthcoming as Jacobson wanted them to be.

Given all that has been described above, and the overwhelming thrust of the contemporaneous litigation records, we find Brown's effort to recast his litigation strategy after the fact as having been wholly dominated by defense of the slander cause of action to be tortured and unpersuasive. Brown admits that the "case was complex from the beginning of my involvement" and that one of his first tasks upon being assigned the matter in late February of 1990 was to review the more than a dozen boxes of documents that arguably were responsive to a demand for production by Jacobson. Brown further admits that the volume of relevant documents "grew substantially after that." Brown Declaration, para. 14. Failing to explain how so many documents could have any bearing on the slander cause of action, and how he was able both to comprehend their implications and keep abreast of the flurry of deposition activity that occurred in the first week of March, Brown boldly insists that he concluded within ten days of being assigned the case (the case that his office had initiated almost three years earlier by filing a complaint seeking total damages in excess of $800,000) that it was not really about breach of contract.[35] In similarly sweeping and unqualified phrases, he asserts that all other aspects of the litigation paled in significance compared to the slander cause of action.[36]

These perceptions, coupled with his fear of Jacobson's superior jury appeal, allegedly led Brown to design a case development strategy in which the overriding objective was to undermine Jacobson's credibility by showing *"that Jacobson, not HLDC, had breached the contract, as HLDC had claimed in its original Complaint."* Brown Decl., para. 21, emphasis in original. Thus Brown attempts to turn the litigation on its head, making all the other disputes

---

**33.** Declaration of Roger A. Brown, filed January 10, 1992, para. 7.

**34.** The summaries of the depositions of the following witnesses contain no suggestion that even one question was directed toward the subject of slander: Ewy, Taggart, Unruh, Yribar, Dean, Peasha, Cook, Ray, and Smith. As noted elsewhere, 12 additional depositions were taken about which we have been provided no informa-

tion. We infer that if any significant portions of those depositions had been devoted to the slander cause of action Homestead would have brought that fact to our attention.

**35.** Brown Decl., para. 18.

**36.** Brown Decl., para. 34.

about what happened on the Fairways job wholly subservient to litigating whether specified allegedly slanderous words were uttered and, if so, what damages those words caused. There is a considerable parallel between Brown's characterization of the underlying litigation and the characterization offered by Lewis J. Soffer, general counsel to HLDC for much of the relevant period, in his two declarations (filed January 10 and February 19 of 1991). Soffer asserts that Eggleston presented the case "as essentially a multi-million dollar claim for damage to business reputation and for lost profits by Jacobson." Soffer Decl. of January 10, 1992, para. 32. This assertion, even if true, falls far short of claiming that it was the alleged slander that caused the harm. As we already have noted, it is appreciably more likely that damage to Jacobson's business reputation resulted from his being terminated and from the alleged failure to pay him so that he could pay his bills.

In the Declaration he filed on February 19, 1992, Soffer further argues that to defend against Jacobson's defamation claims it was necessary for Homestead to litigate (through discovery) virtually every aspect of the Fairways project. The premise that is crucial to even arguable viability of this line of reasoning, however, is that Jacobson's defamation claims were extremely broad. Soffer asserts, in paragraph 4 of this Declaration, that "Jacobson claimed HLDC defamed him by wrongfully stating that Jacobson had failed to perform the services he contracted to perform, inadequately manned the job, and failed to pay his payroll."

A major difficulty with this assertion, of course, is that it bears virtually no relation to the only defamation claim that Jacobson and his counsel actually pled against Homestead (there was a different claim against Canfor) when they re-formulated the cross-complaint in the summer of 1990, *well-after the flurry of discovery in the spring of that year that had allegedly exposed clearly the bases for the slander portion of the case.* Even after all that discovery, the slander claim that Jacobson in fact pled against Homestead was quite

narrow: he based his cause of action on only one kind of slanderous utterance, that he "was going to jail for tax fraud." Amended Cross–Complaint, filed in June of 1990, Sixth Cause of Action, Exhibit B to the Declaration of Roger A. Brown, filed January 10, 1992. He did not claim that any other utterances by Homestead constituted defamation.

Moreover, the fact that he chose to allude vaguely to other "disparaging remarks" in some of his other causes of action, but not even to contend that they rose to the level of defamation, contradicts Mr. Soffer's suggestion that Jacobson was litigating the other negative statements as defamations. If he was not litigating these other alleged utterances as defamations, Homestead cannot argue persuasively that in order to "defend against Jacobson's defamation claims" it was necessary to prove the truth of those utterances, e.g., that Jacobson had failed to meet his contractual obligations, that he had not manned the project adequately, and that he had failed to pay his payroll. It is an even more obvious non-sequitur to suggest, as Soffer does, that in order to defend the defamation claim Homestead was required to disprove *Jacobson's allegation* that Homestead's conduct was largely responsible for his inability to complete the job successfully. There was only one defamation claim; it was narrow; and it was based on an alleged utterance by Homestead, not on assertions by Jacobson.

Not surprisingly, Jacobson's counsel (Eggleston) vigorously rejects the characterization of the litigation that Brown and Soffer present in their declarations. While admitting that he and his client perceived the slander claim as having substance and that the alleged slander was one of many kinds of conduct that they would attempt to prove in order to establish that Homestead had interfered tortiously with Jacobson's business opportunities, Eggleston insists that (1) HLDC continued to press its offensive claims against Jacobson, which were presented as having a value of hundreds of thousands of dollars, all the way up to the point where a settlement was

reached;[37] (2) over the entire course of the litigation, "[p]robably 75% of our work, or more, was defensive in nature,"[38] (3) there remained throughout considerable substance to a great many of the non-slander claims that Jacobson was pursuing, e.g., breach of contract, fraud, and intentional interference with prospective business advantages,[39] (4) and the viability of those other claims, as well as of the other bases for the business interference theory, was not dependent on the slander cause of action.[40]

Because these characterizations of the underlying case are far more consistent with its procedural history, the discovery and motion work done in it, and the billing records presented by counsel, than are the characterizations in the Brown and Soffer declarations, we find that Eggleston's version is essentially accurate[41] and that the others are not. Thus, after critical analysis of their probative power, we find that the net evidentiary effect of the declarations is to suggest that the role in the litigation played by the slander cause of action was only slightly greater than appears from a review of the other evidence.

In sum, we find that throughout its history there was much, much more to this case than the slander cause of action, that the viability of virtually all of the other claims and cross-claims did not depend on proof of slander, and that while Jacobson's slander cause of action and his business tort claims (with their several underpinnings) were not wholly unconnected, it is not true that the slander claim dominated the case or that to defend against it counsel for Homestead would have been required to explicate and explore most of the matters implicated by the contract and business tort aspects of the litigation.

### E. The Allocation Percentages

Our analysis of the structure of the case (based largely on pleadings) during the relevant time period, as set forth in section IV. A., above, suggests that no more than 10% of the lawyering on behalf of Homestead could fairly be attributed to the defense of the slander cause of action. Our analysis of the discovery activity, motion work, and settlement documents suggests that an appropriate allocation figure would be less than 5% if the court accepts the narrower entitlement theory that we recommend, but about 10% if the court accepts the broader entitlement theory. The billing records shed virtually no light on our inquiry. Since the net effect of the declarations, after critical analysis, is to suggest only a slightly greater role for the defamation claim than our review of the other sources of evidence would support, we recommend that the court use an allocation figure of 10% if it accepts the narrower entitlement theory (as described in section III. B., above) and a figure of 15% if it adopts the broader entitlement theory.

Applying these allocation percentages, we recommend that the court declare that Homestead is entitled to either $54,201.03 (10% of the $542,010.29 that was billed to this matter during the relevant time period by Homestead's counsel) or, if the court accepts the broader entitlement theory, $81,301.54 (15% of that same amount).

IT IS SO RECOMMENDED.

---

37. Eggleston Decl., filed January 24, 1992, para. 18, 23.

38. Id., para. 19.

39. Id., para. 15 and 17.

40. Id., para. 11, 12, 15, and 17.

41. It may well be, as Thomas HR Denver asserts in para. 18 of the Declaration he filed on February 20, 1992, that between April and August of 1991, when the settlement was finally negotiat-

ed, "HLDC's primary objective in the underlying action was almost totally the defense of Jacobson's cross-action." This sentence, carefully worded by a lawyer, does *not* say that even during this period Homestead's defensive energies were absorbed primarily by the slander cause of action. Instead, this sentence reports *that those energies were absorbed by the "cross-action"* as a whole, which included, as the evidence fully shows, a lot more than the slander claim.